**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMANDA RUSSELL, LAUREN CAPIRAL, and KATHERINE JOHNSTON, on behalf of themselves and all others similarly situated,

Plaintiffs,

-against-

DESIGNITY, INC. and SHAHROUZ VARSHABI,

Defendants.

Case No. 26 Civ. 1648

**SECOND AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs Amanda Russell, Lauren Capiral, and Katherine Johnston ("Plaintiffs"), by and through their attorneys, Menken Simpson & Rozger LLP, hereby complain of their former employers, Designity, Inc. and Shahrouz Varshabi (collectively, "Defendants," "Designity," or "the company"), as follows:

## NATURE OF THE ACTION

1. Designity is a privately held company that provides on-demand creative services, like marketing, design, and brand work, to business clients.

2. Plaintiffs bring this action on behalf of themselves and a nationwide collective of similarly situated current and former employees of Designity to redress systematic and pervasive violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), including failure to pay minimum wages and overtime premiums.

3. Plaintiffs also bring this action on behalf of themselves and a nationwide Rule 23 class of "Creatives" who have provided services for Designity and its clients and who were

unlawfully denied minimum wage and overtime pay and suffered unlawful deductions from their wages under state law.

4. At present, Plaintiffs' state law claims allege violations of the Oregon Revised Statutes ("ORS") § 653.025 and § 653.261; the Washington Minimum Wage Act, Revised Code of Washington ("RCW") 49.46.020 and 49.46.130; the Massachusetts Wage Act, Massachusetts General Laws ("MGL") c. 151, § 1 and § 1A, and c. 149, § 148; and the Massachusetts Independent Contractor Law, MGL c. 149, § 148B.

## JURISDICTION AND VENUE

5. This Court has original subject matter jurisdiction over Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over their state law claims pursuant to 28 U.S.C. § 1367(a). Plaintiffs' state law claims are so closely related to their FLSA claims that they form part of the same case or controversy under Article III of the United States Constitution.

6. This Court has personal jurisdiction over Designity because Designity maintains its corporate headquarters in this District, does business in this District, and because some of the acts complained of and giving rise to the claims alleged occurred in and emanated from this District.

7. Venue is proper under 28 U.S.C. §§ 1391(b)(1) and (2) because Defendant Designity's principal office is in this District and because a substantial part of the events and omissions giving rise to the claims occurred in this District.

## PARTIES

8. Plaintiff Amanda Russell is an adult individual residing in Portland, Oregon. At all relevant times while working for Defendants, Plaintiff was engaged in commerce within the

meaning of 29 U.S.C. § 206(a) and 29 U.S.C. § 207(a)(1), producing work for Designity clients located in different states.

9. Plaintiff Lauren Capiral is an adult individual residing in Vancouver, Washington. At all relevant times while working for Defendants, Plaintiff was engaged in commerce within the meaning of 29 U.S.C. § 206(a) and 29 U.S.C. § 207(a)(1), producing work for Designity clients located in different states.

10. Plaintiff Katherine Johnston is an adult individual residing in Boston, Massachusetts. At all relevant times while working for Defendants, Plaintiff was engaged in commerce within the meaning of 29 U.S.C. § 206(a) and 29 U.S.C. § 207(a)(1), producing work for Designity clients located in different states. Simultaneous with this Complaint, Ms. Johnston has filed a parallel complaint with the Massachusetts Attorney General pursuant to MGL ch. 149, § 150.

11. Defendant Designity, Inc., is a Delaware corporation with its headquarters and principal place of business in New York, NY. At all relevant times, Designity was an enterprise engaged in commerce within the meaning of 29 U.S.C. § 203(s)(1)(A), with annual gross revenues exceeding $500,000 and employees engaged in interstate commerce.

12. Defendant Shahrouz Varshabi is an adult individual residing in New York. Varshabi is the CEO and Founder of Designity and exercises complete control over hiring, firing, employee discipline, and employee compensation.

13. At all times relevant to this action, Defendants were Plaintiffs' employers and Plaintiffs were employees within the meaning of the FLSA, ORS, RCW, and MGL.

## FLSA COLLECTIVE ACTION ALLEGATIONS

14. Plaintiffs brings their first and second Causes of Action (FLSA minimum wage and overtime claims) on behalf of themselves and all similarly situated persons who work or have worked as "Creatives" (including, but not limited to, "Temporary Emerging Creative," "Senior Creative," and/or "Pro Creative") for Defendants between February 27, 2023, and the date of final judgment and who did not receive the minimum wage for all hours worked and/or overtime for all hours worked over 40 in a workweek, and who elect to join this action pursuant to 29 U.S.C. § 216(b) (the "FLSA Collective").

15. All of the work that Plaintiffs and the FLSA Collective have performed has been assigned by Defendants and Defendants have been aware of all of the work that Plaintiffs and the FLSA Collective have performed.

16. As part of its regular business practice, Designity has intentionally, willfully, and repeatedly engaged in a pattern, practice, and policy of violating the FLSA with respect to Plaintiffs and the FLSA Collective. This conduct includes, but is not limited to:

a. Willfully misclassifying Plaintiffs and members of the FLSA Collective as independent contractors;

b. Willfully misclassifying Plaintiffs and members of the FLSA Collective as exempt;

c. Willfully failing to pay Plaintiffs and the FLSA Collective the minimum wage for all hours worked;

d. Willfully failing to pay Plaintiffs and the FLSA Collective overtime for hours that they worked in excess of 40 hours per workweek; and

e. Willfully failing to record all of the time that Plaintiffs and the FLSA Collective have worked for the benefit of Designity.

17. Defendants are aware or should have been aware that federal law required them to pay Plaintiffs and the FLSA Collective the minimum wage for all hours worked, and to pay an overtime premium for hours worked in excess of 40 per workweek.

18. Defendants' conduct has been widespread, repeated, and consistent.

19. Defendants are liable under the FLSA for failing to properly compensate Plaintiffs and the members of the FLSA Collective.

20. Upon information and belief, the FLSA Collective consists of many similarly situated individuals who have been underpaid by Designity in violation of the FLSA and who would benefit from the issuance of a court-supervised notice of the lawsuit and the opportunity to join the lawsuit. Those similarly situated collective members are known to Defendants, are readily identifiable, and can be located through Defendants' records. Notice should be sent to the members of the FLSA Collective pursuant to 29 U.S.C. § 216(b).

## RULE 23 CLASS ACTION ALLEGATIONS

21. Plaintiffs bring their state law claims on behalf of themselves and a Class of persons under Rule 23 of the Federal Rules of Civil Procedure consisting of all employees of Defendants who worked as Creatives during the applicable statutory periods preceding the filing of this Complaint until Defendants cease their unlawful acts (the "Rule 23 Class").

22. Plaintiff Amanda Russell brings her Oregon state law claims on behalf of a subclass all employees of Defendants who worked as Creatives in Oregon from February 27, 2023, until Defendants cease their unlawful acts (the "Oregon Subclass").

23. Plaintiff Lauren Capiral brings her Washington state law claims on behalf of a subclass all employees of Defendants who worked as Creatives in Washington from February 27, 2023, until Defendants cease their unlawful acts (the "Washington Subclass").

24. Plaintiff Katherine Johnston brings her Massachusetts state law claims on behalf of a subclass all employees of Defendants who worked as Creatives in Massachusetts from February 27, 2023, until Defendants cease their unlawful acts (the "Massachusetts Subclass").

25. The persons in the Class identified above are so numerous that joinder of all members is impracticable. Although the precise number of such persons is presently unknown to Plaintiff, and calculation of such number would require facts in the sole control of Defendants, upon information and belief, Defendants have employed at least 100 such persons during the Class Period, and possibly thousands. Designity's website states that at certain points in its 11-year history it has worked with over 10,000 Creatives.[1]

26. Plaintiffs' claims are typical of the claims of the Class.

27. Plaintiffs will fairly and adequately protect the interests of the Class.

28. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation where an individual plaintiff may lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. The members of the Class have been damaged and are entitled to recovery as a result of Defendants' common and uniform policies, practices and procedures. Although the relative damages suffered by individual class members may not be *de minimis*, such damages are small compared to the expense and burden of individual prosecution of this litigation. In

---

[1] The Story Behind Designity's Name, Designity (Sept. 2, 2021), https://www.designity.com/blog/the-story-behind-designitys-name.

addition, class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

29. Defendants have acted on grounds generally applicable to the Class, thereby making declaratory relief appropriate for the Class, to wit, by misclassifying employees as independent contractors, failing to pay minimum and overtime wages as required by state law, and making unlawful deductions from Creatives' wages in violation of state law.

30. There are questions of law and fact common to the Class and to each Subclass which predominate over any questions solely affecting individual members, including, *inter alia*:

a. Whether Plaintiffs and the Class Members were misclassified as independent contractors under applicable state law;

b. Whether Defendants misclassified Plaintiff and the Class Members as exempt under applicable state law;

c. Whether Defendants kept accurate time and pay records for Plaintiff and the Class as required by applicable state law;

d. Whether Defendants failed to pay Plaintiff and the Class minimum wages as required by applicable state law;

e. Whether Defendants failed to pay Plaintiff and the Class overtime wages at a rate of one- and one-half times their regular rate of pay as required by applicable state law;

f. Whether Defendants made unlawful deductions from Plaintiff's and Class Members' wages in violation of applicable state law; and

g. Whether Defendants' conduct was willful or whether Defendants had reasonable grounds for believing that the acts and omissions alleged herein were in compliance with the law.

## **FACTUAL ALLEGATIONS**

### **Designity's Supervision and Control Over Creatives' Work**

31. Designity is a New York-based company that provides on-demand design and marketing services to businesses.

32. Its services include, but are not limited to, graphic design, motion/animation design, content for advertisements and websites, and branding. In short, it provides services for anything that a company would want for expressing its brand online.

33. Designity employs Creative Directors ("CDs") who work with Designity's clients on their branding needs. Upon information and belief, these CDs are classified as employees.

34. The CDs will assign Creatives like Plaintiffs to prepare the content in accordance with the guidelines and specifications set forth by the CDs.

35. From 2015 through at least February 2026, substantially all Creatives who joined Designity were classified as independent contractors.

36. On information and belief, some Creatives became "W2 employees" during the class period after satisfying a trial period as "1099 independent contractors."

37. On information and belief, all "employee" Creatives were treated the same as "independent contractor" Creatives in all material respects and, like their "independent contractor" peers, did not qualify as exempt professionals under state or federal law.

38. The Creatives are prohibited from working directly with the clients. Instead, they are supervised by the CDs.

39. In the words of Defendant Varshabi, the CDs' responsibilities include "managing [Creatives] to ensure a hassle-free and high-quality outcome."

40. The Creatives are therefore subjected to a host of strict rules, restrictions and regulations by Designity, which asserts near total control over their work.

41. All Creative work is vetted, edited and approved by a CD before the final product is sent to the client.

42. Creatives' work is also formally reviewed by the CDs. Those reviews contribute to the Creatives' "performance scores," which dictate the number of clients the Creatives can work with, their eligibility for "promotions" to higher levels (e.g., from "Senior Creative" to "Pro Creative"), and the amount of compensation they are eligible to receive.

43. All Creatives are forbidden from outsourcing or subcontracting their work to anyone else.

44. Creatives, along with CDs, are also required to attend mandatory "Designity Policy Training" and "AI Learning Sessions" once a month, for an hour each.

45. In June 2025, Designity implemented a policy requiring all Creatives to be in the "virtual office," via Kumospace, with their cameras on for the duration of each workday. The company withdrew the policy, in whole or in part, after a group of nearly two dozen Creatives objected to it.

46. Creatives are also required to comply with Designity's vacation and holiday policies, which mandate that all requests for time off be approved in advance by the company.

47. Many of these rules are communicated to the Creatives in the form of official policy documents. Other rules are communicated via the Designity Slack channel, which all Creatives are required to join.

48. Other rules governing Creatives are set forth, in part, in the standard "1099 Engagement Agreement" which Designity required Creatives to sign beginning in or around 2024. Plaintiffs Amanda Russell and Lauren Capiral both signed this contract.

49. The 1099 Engagement Agreement refers to the purported "contractor" as an "Employee" five different times.

50. Designity, which refers to itself as an "Employer" in the 1099 Engagement Agreement, requires the Creative to, among other things:

a. "Create unique visual graphics and layouts" under Creative Director supervision (1099 Engagement Agreement, ¶ 1).

b. "Deliver projects on-time via the Designity dashboard and implement any requested changes based on feedback received. It's very important to only use the Designity dashboard for delivering projects." *Id.*

c. "Host educational sessions at least once per quarter by collaborating with the members of Innovation Labs and Creative Directors. The topic and details can be discussed with Innovation Labs." *Id.*

d. "Attend internal team meetings such as Monday Morning Planning, Wednesday Review, and Best of Voting Meetings. Bring your full attention and participation to all meetings with the camera turned on. You'll be invited to all the required meetings." *Id.*

e. "[P]erform (i) such other duties as are customarily performed by a contractor in a similar position, and (ii) such other and unrelated services and duties as may be assigned to The Contractor from time to time by Designity Inc." *Id.*

f. Maintain a "minimum workload" as follows: "The Contractor is directly accountable and responsible for taking a minimum of 1 client at the time during the engagement. This means The Contractor needs to actively seek new projects and in the event of lack of projects The Contractor must support Designity with the internal projects." *Id.* at ¶ 2.

g. "[F]ollow all the procedures and guidelines provided by Designity including but not limited to submitting projects using Designity dashboard, replying to job requests, recording looms for deliverables, implementing feedback, engaging in discussion and other activities and more." *Id.* at ¶ 3.

h. "[B]e available Monday to Friday during business hours for client calls and creative collaborations. The Contractor may need to work extra hours to meet deadlines from time to time." *Id.* at ¶ 4.

51. Creatives are prohibited by the contract from working for other companies without permission from Designity, or else they face disciplinary action up to and including termination. This is expressly stated in Paragraph 7 of the 1099 Engagement Agreement:

> **7. Moonlighting Policy:** The Contractor can NOT engage in any other employment, occupation, consulting, or any other business activity (commonly referred to as "moonlighting"), whether full-time, part-time, temporary, or irregular, that could create a potential conflict of interest with their duties during the business hours. Such activities may also impair or interfere with the performance of The Contractor duties, responsibilities, or the efficiency of the department. The Contractor must disclose (in a written format) any current or intended outside employment to Designity for review to ensure compliance with this policy. Non-disclosure or violation of this policy may result in disciplinary action, up to and including termination.

52. Creatives are also subjected to a non-compete, which forbids them from doing any business with 19 named companies (and "other related or similar competitors") during their employment and for *three years* post-employment. *Id.* at ¶ 7.

53. As a result, in addition to being subject to Defendants' control and supervision, Creatives were economically dependent on Defendants for their livelihoods.

54. The contract Designity used prior to the 1099 Engagement Agreement was similarly restrictive.

55. Plaintiff Katherine Johnston, for example, signed a Creative Agreement on May 2, 2023, which included the following provisions:

a. "As a creative at Designity, you'll work remotely under the supervision of our creative directors on a freelance basis. Your creative director is your only main point of contact and he/she will be overseeing your work for quality assurance" (Creative Agreement at 1);

b. "The creative director expects punctual communication from you. This means responding no less than two hours for urgent matters. If you exceed this response window, you will get a notice after your first and second delay. Your contract will be terminated if communication is delayed for a third time. In addition, we host creatives meetings every other week and expect you to attend if you are not tied up with an urgent client matter, school related activities or personal emergencies" (*id.*);

c. "The creative director will define your part [of the project] upfront and communicate all the deliverables needed" (*id.*);

d. "If you're working with a creative director on a monthly basis, you must complete as many revisions deemed necessary by the client or the creative director" (*id.*); and

e. "Any work you have completed under contract with Designity and you wish to showcase in your public or private portfolio first needs to approved by Designity Inc." (*id*. at 2).

56. On or around January 30, 2026, Designity abruptly introduced a new contract (the "US Independent Contractor Agreement") which it required Creatives to sign within twenty-four hours of receipt.

57. Creatives who did not sign the new contract or who asked too many questions, like Plaintiff Amanda Russell, were immediately terminated.

58. Creatives who signed the contract, like Plaintiff Lauren Capiral, were shifted to an hourly pay structure and required to track their work hours. Nothing else about their employment changed.

**Designity's Pay Practices**

59. All Creatives during the relevant time period are and were paid pursuant to the same universal policies and practices.

60. Until February 2026, Designity purported to pay Creatives on a flat per-project or per-client basis.

61. In 2025, for example, Designity posted the following rates on its online "dashboard" for Creatives, specifying that "[a]ll rates are per client per month":

| **Aspiring Creative** | **Emerging Creative** | **Senior Creative** | **Pro Creative** |
|---|---|---|---|
| Temp: $400 | Temp: $400 | Temp: $800 | Temp: $1,100 |

| | | | |
|---|---|---|---|
| Verified: n/a | Verified: $500 | Verified: $850 | Verified: $1,200 |
| Super: n/a | Super: $600 | Super: $900 | Super: $1,300 |

62. Creatives had no power to negotiate higher rates of pay or propose different pay structures.

63. Designity would set the applicable rates for each client and/or project based on the subscription tier the client had chosen to pay for and the "level" or "status" assigned to the Creative.

64. In practice, Creatives frequently had no idea what the methodology was behind their pay, and the amount of money distributed to them every two weeks was impossible to predict.

65. Creatives were not compensated for any of the time they spent at mandatory Designity meetings.

66. When multiple Creatives (like Plaintiff Katherine Johnston) attempted to push back on these pay practices in the company's Slack channel, Defendant Varshabi responded by swiftly terminating their employment.

67. In February 2026, Designity switched to an hourly pay model.

68. Plaintiffs and all other Creatives have also suffered unlawful deductions from their wages as a result of software licenses and subscriptions they were required to purchase, because Designity's clients required specific software applications and/or the subscriptions were necessary for the Creatives to conduct their work for Designity.

**<u>Plaintiff Amanda Russell</u>**

69. Plaintiff Amanda Russell was hired by Defendants for the position of "Temporary Emerging Creative" in April 2024.

70. She signed the 1099 Engagement Agreement on April 8, 2024, and her employment with Designity commenced on April 15, 2024.

71. Under the close supervision and direction of various Creative Directors, she created graphics for various clients. Usually, she was tasked with executing on the Creative Director's vision for a project, which typically entailed creating a visual to help explain a client's product, or to support an advertising campaign.

72. With the exception of one occasion, when a Creative Director brought her into a client meeting, Plaintiff was prohibited from having any contact with Designity's clients.

73. Upon information and belief, when the company learned that this Creative Director had allowed Plaintiff into the client meeting, the Creative Director was admonished by the company.

74. Russell's 1099 Engagement Agreement provided that she would be paid $450 "per client, with the opportunity to make up to $1,350 for taking 3 clients at a time." The contract contained no reference to hours worked, or any indication of whether compensation would change depending on the work to be done.

75. She was repeatedly paid below the minimum wage for hours that she worked and was also deprived of overtime pay.

76. For example, in the final two weeks of 2025, she worked approximately 80 hours and was paid $282.00. This comes out to $3.53 per hour. Some of these hours were overtime hours, as she did not work the exact same hours per week. She was not paid any overtime premium.

77. For the first two weeks of November 2024, she worked a total of approximately 40 hours and was paid $340—well below the Oregon minimum wage.

78. Nearly every week she worked she was paid below the Oregon minimum wage rate.

79. Designity did not track Plaintiff's hours, with the exception of a period in 2025 when she would submit her hours via an online form at the conclusion of a project for a client. This was only done so the company could show clients that its Creatives were giving their projects the time and attention those clients were promised.

80. On January 30, 2026, Plaintiff received an email from Maja Krajewska, Designity's Head of People, entitled: "Important: Updated Agreement & Compensation Structure."

81. Defendant Varshabi was copied on the email, demonstrating his involvement in decisions concerning Creatives' terms of employment and compensation.

82. The email stated, in part, "As part of improvements to our operating model and project workflow, we are transitioning you from the current compensation/contract structure to an hourly compensation model."

83. The email further informed Plaintiff that she now had to track her hours and would be compensated $29 per hour worked, subject to the company's approval.

84. Designity gave Plaintiff a February 1, 2026 deadline to sign the new contract or she would be effectively terminated.

85. Plaintiff wrote Krajewska back within 30 minutes, requesting a meeting to discuss the new contract. She was granted a one-day extension to close of business on February 2, 2026.

86. On February 2, 2026, Ms. Russell wrote to Krajewska and other members of the Leadership Team (including Varshabi) that she needed additional time to retain counsel to assist

her in reviewing the contract, stating, "I hope you understand why I cannot sign any new legal documents without fully understanding the terms."

87. The following day, Krajewska responded, in part: "The updated agreement was due Sunday, February 1, and we extended the deadline through Monday, February 2 (EOD). Since we have not received a signed agreement by the extended deadline, we will be withdrawing the agreement and closing out your access. Your access will be closed out today. We will not be assigning further work going forward."

**Plaintiff Lauren Capiral**

88. Plaintiff Lauren Capiral (formerly Lauren Stanton) was hired by Defendants as a "Temporary Senior Creative" effective October 16, 2024, based out of Washington State.

89. She signed the standard 1099 Engagement Agreement on October 15, 2024, after multiple rounds of interviews with Defendant Varshabi, a Creative Director, and other members of Designity leadership.

90. The 1099 Engagement Agreement was executed by Defendant Varshabi.

91. The 1099 Engagement Agreement provided that Ms. Capiral would receive "$800 per client, with the opportunity to make up to $2400 for taking 3 clients at a time."

92. Under the close supervision of various Creative Directors, Ms. Capiral worked on projects for Designity's clients involving UX/UI web design and website optimization.

93. Designity's Creative Directors would run the projects, set the creative direction, act as the point of contact with the client, and decide the project timelines.

94. Despite living and working in Washington, Ms. Capiral typically needed to be available during East Coast hours because that is where most of the Creative Directors she worked with were located.

95. Ms. Capiral never had direct contact with any of Designity's clients.

96. At one point, Ms. Capiral was listed on Designity's website as one of its "Top 10 Creatives," meaning she performed high-volume, high-quality work for the company's clients.

97. Despite this, Defendants routinely paid Ms. Capiral below state and federal minimum wage levels.

98. She was regularly forced to comply with extreme end-of-day and next-day deadlines, sometimes for 3-5 clients at a time, requiring her to work at least 30-40 hours most weeks.

99. On May 31, 2025, for example, Defendants paid Plaintiff Capiral a total of $508 for two weeks of work between May 15 and May 30. She performed work for at least four different clients during this time period and worked at least 40 hours each week, resulting in an hourly rate of approximately $6.35.

100. Between May 1 and 14, 2025, she juggled projects for at least five clients and worked more than 40 hours during one or both weeks. Defendants failed to pay her any overtime premiums.

101. Ms. Capiral was also required to pay for her own software licenses and subscriptions in order to perform work for Designity's clients, including Figma, Adobe, Canva, and an AI tool called Mid Journey.

102. In December 2025, Ms. Capiral was forced to pay out of pocket for an extra seat on her Figma subscription just so that a Creative Director could edit her work.

103. In July 2025, Plaintiff Capiral approached Defendant Varshabi about becoming a W2 employee for the company.

104. In response, Defendant Varshabi told her that he would "inform the team to review [her] performance score." "In the meantime," he instructed her to "please continue to maintain a high performance score and follow our guidelines, as these factors are important in our evaluation process."

105. Varshabi never followed up about reclassifying Capiral as a W2 employee.

106. On February 1, 2026, Ms. Capiral executed the new US Independent Contractor Agreement, which provided that she would be paid $43 per hour.

107. The contract specified that she would "compensated **only for hours that are assigned** by the Company's Creative Project Manager ('CPM') or Creative Director ('CD') or Designity's Executive team" (emphasis in original), and that she would not be "entitled to compensation for hours not assigned/approved."

108. Ms. Capiral resigned from Designity in March 2026.

**Plaintiff Katherine Johnston**

109. Designity hired Plaintiff Katherine Johnston (based in Massachusetts) as a "Senior Creative" in May 2023 after multiple rounds of interviews with Defendant Varshabi and other members of Designity leadership.

110. She signed the company's then-standard contract (the "Creative Agreement") on May 2, 2023. The contract was countersigned by Defendant Varshabi and classified her as a "freelance" independent contractor.

111. The Creative Agreement provided that she would be paid as follows: "The budget for each project varies and you may get paid either on a by-project basis or a monthly basis. The creative director will communicate the budget and the type of payment upfront. If you're paid on

a project basis, you'll be paid after the project is 100% completed. For larger projects, you'll be paid after the specified milestones. Payments are rendered at the end of the month."

112. Under the close supervision of various Creative Directors, Ms. Johnston worked on copywriting projects for Designity's clients. She never had independent discretion over the final product and was required to comply with the Creative Directors' vision and directives.

113. Like Plaintiff Lauren Capiral, Ms. Johnston was also designated one of Designity's Top 10 Creatives in recognition of the high-volume, high-quality work she did for Designity's clients.

114. In January 2025, Defendant Varshabi recognized Ms. Johnston's value to the company (and demonstrated the extent of his involvement in day-to-day operations) by asking her to join a workshop where he planned to discuss Designity's workflows and business model with a small group of select individuals. Writing to her on Slack, he explained that he wanted to reach out to her specifically because he "highly valued" her perspective and experiences.

115. Designity regularly paid Ms. Johnston below state and federal minimum wage rates and failed to pay her overtime premiums.

116. On May 15, 2024, for example, Designity paid Ms. Johnston a total of $56 for all of her work between May 1 and May 14. She certainly worked more than 8 hours during this time period and therefore earned less than the federal minimum wage ($7.25 per hour) and substantially less than the state minimum wage ($15.00 per hour).

117. Ms. Johnston also worked over 40 hours per week in (for example) March, April, and July 2025, but was never paid any overtime premiums.

118. Ms. Johnston was required to pay for her own tools, including her computer and subscriptions to services like Canva, SEMRush, and SERPStat, in order to perform work for Designity's clients.

119. On other occasions, Designity failed to pay Ms. Johnston on time or paid her less than it had promised.

120. In the summer and fall of 2025, she began asking questions about Designity's pay practices on Slack, where leadership frequently shared policy and other updates. Every time, a member of Designity leadership would reprimand her for asking questions publicly and direct her to speak with them in private.

121. In July 2025, for example, Ms. Johnston wrote on Slack that she was hoping someone could "shed some retroactive light on" Designity's pay practices for her, because she had been reviewing her paysheet for the past 12 months and noticed that she was not consistently paid at the rates that Designity had guaranteed to her. She also noted that her hourly rate had fallen below the Massachusetts minimum wage rate (at that time $15.00 per hour).

122. Designity's Head of People, Maja Krajewska, responded by messaging Ms. Johnston privately: "We'd like to keep the main channel focused on company-wide updates, but we also want to make sure you feel heard." Ms. Johnston responded, in part, that a private conversation was improper under the circumstances because "the larger community has a vested stake in the conversation."

123. In November 2025, Ms. Johnston posted in the Designity Slack channel again, noting that she had not been paid for her work and asking if anyone else was experiencing a similar issue.

124. Almost immediately after she sent this message in November 2025, Defendant Varshabi deactivated her Slack account and followed up with an email letting her know that she would no longer be working for Designity—all because she had dared to ask questions about Defendants' pay practices.

125. A Designity employee named Nicolle Ginter then publicly announced on Slack, for all of Ms. Johnston's colleagues to see, that Ms. Johnston had been terminated for "unprofessionalism" and "concerns around communication," noting, "Unfortunately, things couldn't be resolved in a way that supported a healthy and constructive environment for everyone." Ms. Johnston, who had been removed from the Designity Slack channel, only found out about this because multiple colleagues contacted her out of concern about Ginter's message.

126. Meanwhile, Defendant Varshabi drafted a thinly veiled post about Ms. Johnston on his public LinkedIn account, calling out "the Criticizers" at Designity—those he described as "the lowest performers, the least engaged, and ironically the loudest in the room," who "criticize and humiliate others publicly, no matter what you accomplish." He ended his post with a sigh of relief that he had decided to terminate her: "Their departures from your company or even life feel like a relief. There's a reason for that."

## FIRST CAUSE OF ACTION
**Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.***
**Failure to Pay Overtime Wages**
**Against All Defendants**

127. Plaintiffs repeat and incorporate by reference all of the above allegations as though fully set forth herein.

128. Defendants violated the rights of Plaintiffs and putative Collective Members by failing to pay overtime compensation at a rate not less than one and one-half times the regular

rate of pay for each hour worked in excess of 40 in a week, in violation of the FLSA, 29 U.S.C. § 207(a)(1).

129. Defendants' failure to pay overtime compensation was willful within the meaning of the FLSA, 29 U.S.C. § 255.

130. Defendants are therefore liable to Plaintiffs and putative Collective Members for their unpaid overtime compensation, plus an additional equal amount as liquidated damages, reasonable attorney's fees and costs, and any other appropriate relief pursuant to the FLSA.

## SECOND CAUSE OF ACTION
**Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.***
**Failure to Pay Minimum Wages**
**Against All Defendants**

131. Plaintiffs repeat and incorporate by reference all of the above allegations as though fully set forth herein.

132. Defendants violated the rights of Plaintiffs and putative Collective Members by failing to pay the minimum wage for each hour worked, in violation of the FLSA, 29 U.S.C. § 206(a).

133. Defendants' failure to pay minimum wages was willful within the meaning of the FLSA, 29 U.S.C. § 255.

134. Defendants are therefore liable to Plaintiffs and putative Collective Members for their unpaid minimum wages, plus an additional equal amount as liquidated damages, reasonable attorney's fees and costs, and any other appropriate relief pursuant to the FLSA.

**THIRD CAUSE OF ACTION**
**(On Behalf of Plaintiff Amanda Russell and the Oregon Subclass, Against All Defendants)**
**Oregon Revised Statutes, O.R.S. § 653.025 and § 653.055**
**Failure to Pay Minimum Wages**

135. Plaintiffs repeat and incorporate by reference all the above allegations as if fully set forth herein.

136. O.R.S. § 653.025 requires employers to compensate their employees who perform more than 50% of their work at a location other than the employer's permanent fixed business location at a rate no less than $16.30 per hour where the employee worked within the urban growth boundary, $15.05 per hour where the employee worked outside the urban growth boundary, and $14.05 where the employee worked within a nonurban county.

137. Defendants willfully violated Plaintiff Amanda Russell's and putative Class Members' rights by failing to pay them wages due and owing for work performed in violation of O.R.S. § 653.025.

138. Due to Defendants' minimum wage violations, Plaintiff Russell and the putative Class Members are entitled to recover from Defendants their unpaid wages, civil penalties in the amount of 240 times their hourly wage rate, reasonable attorneys' fees and costs of the action, pre-judgement and post-judgment interest, and all other relief the Court finds just and proper.

**FOURTH CAUSE OF ACTION**
**(On Behalf of Plaintiff Amanda Russell and the Oregon Subclass, Against All Defendants)**
**Oregon Revised Statutes, O.R.S. § 653.261 and § 653.055**
**Failure to Pay Overtime Wages**

139. Plaintiffs repeat and incorporate by reference all the above allegations as if fully set forth herein.

140. O.R.S. § 653.261 requires employers to compensate their employees at a rate not less than one and one-half times their regular rate of pay for hours worked in excess of 40 in a week.

141. Defendants willfully violated Plaintiff Amanda Russell's and putative Class Members' rights by failing to pay them wages due and owing for work performed in excess of 40 hours in a week in violation of O.R.S. § 653.261.

142. Due to Defendants' failure to pay overtime wages due and owing, Plaintiff Russell and the putative Class Members are entitled to recover from Defendants their unpaid overtime wages, civil penalties, reasonable attorneys' fees and costs of the action, pre-judgment and post-judgment interest, and all other relief the Court finds just and proper.

**FIFTH CAUSE OF ACTION**
**(On Behalf of Plaintiff Amanda Russell and the Oregon Subclass, Against All Defendants)**
**Oregon Revised Statutes, O.R.S. § 652.610 and § 652.615**
**Unlawful Deductions from Wages**

185. Plaintiffs repeat and incorporate by reference all of the above allegations as if fully set forth herein.

186. At all times relevant to this action, Plaintiff Amanda Russell and members of the putative Oregon Subclass were employees of Defendants, who controlled the terms and conditions of their employment.

187. O.R.S. § 652.610(3) prohibits an employer from withholding, deducting, or diverting any portion of an employee's wages unless the deduction is required or authorized by law, is authorized in writing by the employee for the employee's benefit and not to the employer's benefit, or otherwise falls within a narrow statutory exception.

188. Defendants required Plaintiff Russell and the Oregon Subclass to purchase, at their own expense, the software licenses and subscriptions necessary to perform work for

Defendants and Defendants' clients, thereby diverting a portion of their wages for Defendants' benefit.

189. These deductions were not required or authorized by law, were not authorized in writing by the employees for their own benefit, and inured to the benefit of Defendants.

190. Defendants' conduct was not an inadvertent error made in good faith, nor did Defendants have reasonable grounds for believing that the acts and omissions alleged herein were in compliance with the law.

191. O.R.S. § 652.615 creates a private cause of action for a violation of O.R.S. § 652.610(3), providing for actual damages or $200, whichever is greater, and reasonable costs and attorney fees to the prevailing party.

192. Plaintiff Russell seeks to recover, on her own behalf and on behalf of the Oregon Subclass, actual damages or the statutory minimum of $200 per violation, whichever is greater, together with reasonable attorneys' fees and costs, pre-judgment and post-judgment interest, and all other relief the Court finds just and proper.

**SIXTH CAUSE OF ACTION**
**(On Behalf of Plaintiff Lauren Capiral and the Washington Subclass, Against All Defendants)**
**Washington Minimum Wage Act, RCW 49.46.020, 49.46.090, and 49.48.030**
**Failure to Pay Minimum Wages**

143. Plaintiffs repeat and incorporate by reference all of the above allegations as though fully set forth herein.

144. At all times relevant to this action, Plaintiff Lauren Capiral and members of the putative Washington Subclass were employees of Defendants, who controlled the terms and conditions of their employment.

145. RCW 49.46.020 requires employers to pay employees wages at a rate no less than the applicable Washington minimum wage.

146. At all times relevant to this action, Defendants misclassified Plaintiff Lauren Capiral and Washington Subclass Members as independent contractors in order to avoid paying them minimum wages in accordance with Washington law.

147. Defendants' conduct was not an inadvertent error made in good faith, nor did Defendants have reasonable grounds for believing that the acts and omissions alleged herein were in compliance with the law.

148. Plaintiff Lauren Capiral seeks to recover, on her own behalf and on behalf of the Washington Subclass, compensatory damages, liquidated damages and/or civil penalties (where applicable), attorneys' fees and costs, pre-judgment and post-judgment interest, and all other relief the Court finds just and proper.

**<u>SEVENTH CAUSE OF ACTION</u>**
**(On Behalf of Plaintiff Lauren Capiral and the Washington Subclass, Against All Defendants)**
**Washington Minimum Wage Act, RCW 49.46.130, 49.46.090, and 49.48.030**
**Failure to Pay Overtime Wages**

149. Plaintiffs repeats and incorporate by reference all of the above allegations as though fully set forth herein.

150. At all times relevant to this action, Plaintiff Lauren Capiral and members of the putative Washington Subclass were employees of Defendants, who controlled the terms and conditions of their employment.

151. RCW 49.46.130 requires employers to pay employees compensation at a rate not less than one and one-half times the regular rate at which they are employed for hours worked in excess of 40 in a workweek.

152. At all times relevant to this action, Defendants misclassified Plaintiff Lauren Capiral and Washington Subclass Members as independent contractors in order to avoid paying them overtime at a rate of time and one-half their regular rate of pay for all hours worked in excess of 40 in a week.

153. Defendants' conduct was not an inadvertent error made in good faith, nor did Defendants have reasonable grounds for believing that the acts and omissions alleged herein were in compliance with the law.

154. Plaintiff Lauren Capiral seeks to recover, on her own behalf and on behalf of the Washington Subclass, compensatory damages, liquidated damages and/or civil penalties (where applicable), attorneys' fees and costs, pre-judgment and post-judgment interest, and all other relief the Court finds just and proper.

**EIGHTH CAUSE OF ACTION**
**(On Behalf of Plaintiff Lauren Capiral and the Washington Subclass, Against All Defendants)**
**Washington Wage Rebate Act, RCW 49.52.050 and RCW 49.52.070**
**Unlawful Withholding and/or Rebate of Wages**

155. Plaintiffs repeat and incorporate by reference all of the above allegations as though fully set forth herein.

156. At all times relevant to this action, Plaintiff Lauren Capiral and members of the putative Washington Subclass were employees of Defendants, who controlled the terms and conditions of their employment.

157. RCW 49.52.050 prohibits an employer, officer, vice principal or agent of an employer from collecting or receiving a rebate of any part of wages paid to an employee, and from willfully and with intent to deprive an employee of wages, paying any employee a lower wage than the wage the employer is obligated to pay by statute, ordinance, or contract.

158. Defendants unlawfully withheld wages from Plaintiff Lauren Capiral and Washington Subclass Members, and/or caused Plaintiff Lauren Capiral and Washington Subclass Members to rebate wages to Defendants, by failing to pay minimum wages and overtime wages due and owing and by imposing deductions and expenses for Defendants' benefit.

159. Defendants' conduct was not an inadvertent error made in good faith, nor did Defendants have reasonable grounds for believing that the acts and omissions alleged herein were in compliance with the law.

160. RCW 49.52.070 provides for civil liability for twice the amount of wages unlawfully rebated or withheld, together with costs of suit and a reasonable sum for attorney's fees.

161. Plaintiff Lauren Capiral seeks to recover, on her own behalf and on behalf of the Washington Subclass, unpaid wages, exemplary (double) damages, attorneys' fees and costs, pre-judgment and post-judgment interest, and all other relief the Court finds just and proper.

## NINTH CAUSE OF ACTION
**(On Behalf of Plaintiff Katherine Johnston and the Massachusetts Subclass, Against All Defendants)**
**Massachusetts Minimum Fair Wage Law, MGL c. 151, § 1 and § 20**
**Failure to Pay Minimum Wages**

162. Plaintiffs repeat and incorporate by reference all of the above allegations as though fully set forth herein.

163. At all times relevant to this action, Plaintiff Katherine Johnston and Massachusetts Subclass Members were employees of Defendants, who controlled the terms and conditions of their employment.

164. M.G.L. c. 151, § 1 declares it against public policy for an employer to employ any person in an occupation in Massachusetts at an oppressive and unreasonable wage, and provides

that a wage of less than $15.00 per hour shall conclusively be presumed to be oppressive and unreasonable.

165. At all times relevant to this action, Defendants misclassified Plaintiff Katherine Johnston and Massachusetts Subclass Members as independent contractors in order to avoid paying them minimum wages in accordance with Massachusetts law.

166. Defendants' conduct was not an inadvertent error made in good faith, nor did Defendants have reasonable grounds for believing that the acts and omissions alleged herein were in compliance with the law.

167. Plaintiff Katherine Johnston seeks to recover, on her own behalf and on behalf of the Massachusetts Subclass, compensatory damages, treble damages, attorneys' fees and costs, pre-judgment and post-judgment interest, and all other relief the Court finds just and proper.

**TENTH CAUSE OF ACTION**
**(On Behalf of Plaintiff Katherine Johnston and the Massachusetts Subclass, Against All Defendants)**
**Massachusetts Minimum Fair Wage Law, MGL c. 151, § 1A and § 1B**
**Failure to Pay Overtime Wages**

168. Plaintiffs repeat and incorporate by reference all of the above allegations as though fully set forth herein.

169. At all times relevant to this action, Plaintiff Katherine Johnston and Massachusetts Subclass Members were employees of Defendants, who controlled the terms and conditions of their employment.

170. M.G.L. c. 151, § 1A requires employers to pay employees compensation for employment in excess of forty hours in a workweek at a rate not less than one and one-half times the regular rate at which they are employed.

171. At all times relevant to this action, Defendants misclassified Plaintiff Katherine Johnston and Massachusetts Subclass Members as independent contractors in order to avoid paying them overtime at a rate of time and one-half their regular rate of pay for all hours worked in excess of 40 in a week.

172. Defendants' conduct was not an inadvertent error made in good faith, nor did Defendants have reasonable grounds for believing that the acts and omissions alleged herein were in compliance with the law.

173. Plaintiff Katherine Johnston seeks to recover, on her own behalf and on behalf of the Massachusetts Subclass, compensatory damages, treble damages, attorneys' fees and costs, pre-judgment and post-judgment interest, and all other relief the Court finds just and proper.

## ELEVENTH CAUSE OF ACTION
**(On Behalf of Plaintiff Katherine Johnston and the Massachusetts Subclass, Against All Defendants)**
**Massachusetts Independent Contractor Law, MGL c. 149, § 148B and § 150 Misclassification**

174. Plaintiffs repeat and incorporate by reference all of the above allegations as though fully set forth herein.

175. At all times relevant to this action, Plaintiff Katherine Johnston and Massachusetts Subclass Members performed services for Defendants.

176. M.G.L. c. 149, § 148B provides that, for purposes of chapters 149 and 151, an individual performing any service shall be considered an employee unless the individual is free from control and direction in connection with the performance of the service, the service is performed outside the usual course of the employer's business, and the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

177. Defendants misclassified Plaintiff Katherine Johnston and Massachusetts Subclass Members as independent contractors notwithstanding Defendants' control over the terms and conditions of their work, the fact that their services were performed within the usual course of Defendants' business, and the fact that they were not customarily engaged in independently established businesses of the same nature as the services performed for Defendants.

178. Defendants' misclassification caused Plaintiff Katherine Johnston and Massachusetts Subclass Members to be denied the protections of Massachusetts wage and hour law, including the right to minimum wages and overtime wages.

179. Defendants' conduct was not an inadvertent error made in good faith, nor did Defendants have reasonable grounds for believing that the acts and omissions alleged herein were in compliance with the law.

180. M.G.L. c. 149, § 148B provides that entities and the president and treasurer of a corporation and any officer or agent having management of the corporation or entity shall be liable for violations of the section, and states that nothing in the section limits the availability of other remedies at law or in equity.

181. Plaintiff Katherine Johnston seeks to recover, on her own behalf and on behalf of the Massachusetts Subclass, compensatory damages (including the value of lost wages and other benefits), treble damages, attorneys' fees and costs, pre-judgment and post-judgment interest, and all other relief the Court finds just and proper.

**TWELFTH CAUSE OF ACTION**
**(On Behalf of Plaintiff Katherine Johnston and the Massachusetts Subclass, Against All Defendants)**
**Massachusetts Wage Act, M.G.L. c. 149, § 148 and § 150**
**Unlawful Deductions from Wages / Prohibited Special Contract**

212. Plaintiffs repeat and incorporate by reference all of the above allegations as though fully set forth herein.

213. At all times relevant to this action, Plaintiff Katherine Johnston and Massachusetts Subclass Members were employees of Defendants, who controlled the terms and conditions of their employment (or can otherwise be held liable by statute for the wage and hour violations set forth herein).

214. M.G.L. c. 149, § 148 requires the full and timely payment of all wages earned and prohibits an employer, by special contract or any other means, from exempting itself from the obligation to pay wages in full. An employer may not deduct or withhold earned wages absent a valid attachment, assignment, or set-off reflecting a clear and established debt owed by the employee to the employer, and an employee's assent to such a deduction does not render it lawful.

215. Defendants required Plaintiff Johnston and the Massachusetts Subclass to bear the cost of tools, equipment, and software necessary to perform their work for Defendants and Defendants' clients, thereby deducting from and withholding earned wages for Defendants' benefit.

216. These deductions did not reflect any valid attachment, assignment, or set-off for a clear and established debt owed by the employees to Defendants and constituted an unlawful shifting of Defendants' ordinary business expenses onto their employees in violation of M.G.L. c. 149, § 148.

217. M.G.L. c. 149, § 148B(d) and § 148 provide that the president and treasurer of a corporation and any officer or agent having the management of the corporation shall be deemed employers liable for violations of the Wage Act, rendering Defendant Varshabi individually liable.

218. Simultaneously with the filing of the original Complaint, Plaintiff Johnston filed a complaint with the Massachusetts Attorney General pursuant to M.G.L. c. 149, § 150.

219. Defendants' conduct was not an inadvertent error made in good faith, nor did Defendants have reasonable grounds for believing that the acts and omissions alleged herein were in compliance with the law.

220. Plaintiff Johnston seeks to recover, on her own behalf and on behalf of the Massachusetts Subclass, the amounts unlawfully deducted and withheld, treble damages as liquidated damages pursuant to M.G.L. c. 149, § 150, attorneys' fees and costs, pre-judgment and post-judgment interest, and all other relief the Court finds just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for the following relief:

a. Certification of this case as a class and collective action pursuant to Rule 23 of the Federal Rules of Civil Procedure and the FLSA, 29 U.S.C. § 216(b);

b. Designation of Plaintiffs Amanda Russell, Lauren Capiral, and Katherine Johnston as representative of the Class, and counsel of record as Class Counsel;

c. For Plaintiffs and the FLSA Collective: Unpaid minimum and overtime wages, liquidated damages, reasonable attorney's fees and costs, and any other appropriate relief pursuant to the FLSA, 29 U.S.C. § 216(b);

d. For Plaintiffs and the proposed Rule 23 Class: Unpaid minimum and overtime wages, liquidated and/or treble damages where applicable, attorneys' fees, costs, interest, civil penalties, and any other appropriate relief pursuant to the ORS, RCW, and MGL;

e. Such additional and further relief as the Court finds just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury on all questions of fact raised by the Complaint.

Dated: August 6, 2026
New York, New York

**MENKEN SIMPSON & ROZGER LLP**

*/s/ Scott Simpson*
*/s/ Raya F. Saksouk*
Scott Simpson
Raya F. Saksouk
225 Broadway, Suite 920
New York, NY 10007
(212) 509-1616
ssimpson@nyemployeelaw.com
rsaksouk@nyemployeelaw.com

*Attorneys for Plaintiff and the Putative Class and Collective*